**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jacob Robbins, | No. CV-23-00362-TUC-AMM (EJM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Pima County, | |
| Defendant. | |

Currently pending before the Court is Defendant Pima County's Motion for Summary Judgment (Doc. 49). Defendant has also filed a Separate Statement of Facts ("SOF") (Doc. 50). Plaintiff filed his Response to Defendant's Motion for Summary Judgment (Doc. 53), as well as Controverting and Separate Statement of Facts in Support of Response to Defendant's Motion for Summary Judgment ("CSOF") (Doc. 54), and Defendant replied (Doc. 57). As such, the motion is fully briefed and ripe for adjudication.

Pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure, this matter was referred to Magistrate Judge Markovich for Report and Recommendation. On January 29, 2026, Judge Markovich heard oral argument. Minute Entry 1/29/2026 (Doc. 59). For the reasons discussed below, the Court recommends granting Defendant's motion for summary judgment.

. . .

. . .

. . .

1    **I.      STANDARD OF REVIEW**

2          Summary judgment is appropriate when, viewing the facts in the light most

3    favorable to the nonmoving party, *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255,

4    (1986), "there is no genuine issue as to any material fact and [] the moving party is

5    entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it

6    "might affect the outcome of the suit under the governing law," and a dispute is

7    "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

8    nonmoving party."  *Anderson*, 477 U.S. at 248.  Thus, factual disputes that have no

9    bearing on the outcome of a suit are irrelevant to the consideration of a motion for

10   summary judgment.  *Id*.  In order to withstand a motion for summary judgment, the

11   nonmoving party must show "specific facts showing that there is a genuine issue for

12   trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Moreover, a "mere scintilla of

13   evidence" does not preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 252.

14   The United States Supreme Court also recognized that "[w]hen opposing parties tell two

15   different stories, one of which is blatantly contradicted by the record, so that no

16   reasonable jury could believe it, a court should not adopt that version of the facts for

17   purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372,

18   380 (2007).

19         The Local Rules require that "[a]ny party filing a motion for summary judgment

20   must file a statement, separate from the motion and memorandum of law setting forth

21   each material fact on which the party relies in support of the motion."  LRCiv 56.1(a).

22   "Each material fact in the separate statement must be set forth in a separately numbered

23   paragraph and must refer to a specific admissible portion of the record where the fact

24   finds support (for example, affidavit, deposition, discovery response, etc.)."  *Id*.  Only

25   material facts should be included, "[o]ther undisputed facts (such as those providing

26   background about the action or parties) may be included in the memorandum of law, but

27   should not be included in the separate statement of facts."  *Id*.

28         "Any party opposing a motion for summary judgment must file a statement,

separate from that party's memorandum of law setting forth:"

> (1) for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed; and (2) any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party.  Each additional fact must be set forth in a separate numbered paragraph and must refer to a specific admissible portion of the record where the fact finds support.  No reply statement of facts may be filed.

LRCiv 56.1(b).  "Although the nonmoving party's separate controverting statement of facts may include 'additional facts,' it should not include undisputed facts, such as background about the action or the parties." *Rizzo v. City of Phoenix*, No CV-15-00829-PHX-NVW, 2017 WL 3215651, at *2 (July 28, 2017).  Additionally, "any objection in [a] party's response to the separate statement of material facts must be stated summarily without argument."  LRCiv 7.2(m)(2).

## II.    FACTUAL BACKGROUND

To the extent that the facts are undisputed, the Court relies primarily on Defendant's Statement of Facts.  Where disputes occur, Plaintiff's objections are noted; however, the Court has not considered any argument contained in his Controverting and Separate Statement of Facts in Support of Response to Defendant's Motion for Summary Judgment ("CSOF") (Doc. 54).  Neither has the Court included Plaintiff's extensive background factual statements, those which merely reiterate what Defendant stated in the first instance, or those which relate to claims which were not raised in his complaint, which were improperly raised in Plaintiff's CSOF (Doc. 54).  *See* LRCiv 7.2(m)(2).

### A.    *Plaintiff's Employment with the Pima County Sheriff's Department—Overview*

In 2006, Plaintiff Jacob Robbins began his employment with the Pima County Sheriff's Department ("PCSD") as a Corrections Officer assigned to Pima County

Detention Center.  SOF ¶ 1; Compl. (Doc. 1) ¶ 12.  In January 2020, Plaintiff was promoted to Corrections Sergeant.  *Id*.  On October 10, 2021, he received a pay increase.  SOF (Doc. 50) ¶ 2 & Pima Cnty. Human Resources—*Employee Personnel Action Form* (Exh. "1").  Plaintiff has cerebral palsy, and Defendant Pima County was aware of this disability during his employment.  SOF (Doc. 50) ¶ 3; CSOF (Doc. 54) ¶ 56; Compl. (Doc. 1) ¶ 17.

### B.    COVID-19 Vaccination Requirements

On October 21, 2021, due to the ongoing health and safety risks caused by the COVID-19 pandemic, County Administrator Chuck Huckelberry issued a memorandum requiring all Pima County employees who work with vulnerable populations to become fully vaccinated against COVID-19.  SOF (Doc. 50) ¶ 4 & Memorandum from C.H. Huckelberry to Pima Cnty. Bd. of Supervisors; Presiding Judge, Super. Ct.; Elected Officials; and Appointing Authorities (Oct. 21, 2021) (Exh. "2").  The memorandum's definition of vulnerable populations included "those confined either in a detention or correctional facility[.]"  *Ibid*.  On November 2, 2021, the Board of Supervisors issued a similar memorandum requiring employees who work with vulnerable populations to be vaccinated by January 1, 2022.  SOF (Doc. 50) ¶ 6 & Memorandum from Pima Cnty. Bd. of Supervisors, *COVID-19 Vaccinations of Employees who Work with Vulnerable Populations* (Nov. 2, 2021) (Exh. "3").

On November 4, 2021, Pima County issued FAQs related to how it will treat employees who work with vulnerable populations who cannot be vaccinated against COVID-19 due to a medical condition or sincerely held religious belief.  *Id*. ¶ 7 & *COVID -19 Vaccination Requirements for New Hires, Promotions, and Employees Working with Vulnerable Populations* (Exh. "4").  For those with a medical condition, Pima County would follow Administrative Procedure 23-29, Reasonable Accommodation of Applicants and Employees with Disabilities.  *Id*. ¶ 8 & Exh. 4 at FAQ No. 5.  Pima County has an American's with Disabilities Act ("ADA") program to deal with requests for accommodation, including reassignment as an accommodation of last

1  resort.[1]  *Id.* ¶ 9 & Admin. Proc. No. 23-29, *Reasonable Accommodation of Applicants*
2  *and Employees with Disabilities* (Exh. "5") & Pima Cnty. Merit Sys. R., R. 8, *Promotion,*
3  *Demotion, Reappointment, Open Range Reappointment, Reassignment and Detail* (Eff.
4  Date 3/17/2020) (Exh. "6").

5        **C.    Initial Contact with Human Resources**

6        On November 5, 2021, Plaintiff called Pima County Human Resources ("HR")
7  requesting information about the ADA accommodations process, and papers to self-
8  report the need for an accommodation were sent to him that same day.  SOF (Doc. 50) ¶
9  10 & E-mail from Emily Kruspig, Nurse Liaison, Pima Cnty. HR, to Jacob Robbins
10  (Nov. 5, 2021, 03:29:00 PM) (Exh. "7").  On December 13, 2021, Pima County HR
11  followed up with Plaintiff to see if he intended to seek a workplace accommodation and
12  asked that he send completed forms.  *Id.* ¶ 11 & E-mail from Carmen Inocencio, ADA
13  Coordinator, Pima Cnty. HR, to Jacob Robbins (Dec. 13, 2021, 11:12 AM) (Exh. "8").
14  On December 15, 2021, Plaintiff faxed Pima County completed ADA medical inquiry
15  form stating that he was medically unable to receive the COVID-19 vaccine.  *Id.* ¶ 12 &
16  Robbins ADA Forms (Exh. "9").  The following day, the ADA panel found Plaintiff
17  eligible for workplace accommodations and soon after initiated the interactive process
18  with PCSD to determine what accommodations might be appropriate.  *Id.* ¶ 13 & Pima
19  Cnty.  ADA  Panel  Review  Form—Verification  of  Eligibility  for  Reasonable
20  Accommodations 12/16/2021 (Exh. "10") & E-mail from Carmen Inocencio, ADA
21  Coordinator, Pima Cnty. HR, to Yvonne Garcia (Dec. 20, 2021 04:16 PM) (Exh. "11").

22        Around this time, Pima County HR spoke with PCSD about the possibility of
23  Plaintiff being reassigned to PCSD headquarters and was told Plaintiff could not be
24  reassigned because he would need to be vaccinated to respond to the Detention Center.[2]

25  ───────────────

26        [1] Plaintiff disputes Defendant's description of its ADA program as "robust."  CSOF
27  (Doc. 54) ¶ 9.  It is undisputed that Defendant does have an ADA program as provided in SOF
   (Doc. 50), Exh. "5."  The remainder of Plaintiff's objection is unrelated to the existence of the
28  ADA program and will not be considered here.

        [2] Plaintiff disputes this evidence arguing that it misconstrues the evidence, as well as

1    SOF (Doc. 50) ¶ 14 & Anderson Depo. at 77:13–79:3 (Jan. 9, 2025) (Exh. "12") &

2    Kruspig Depo. at 52:2–11 (Oct. 17, 2024) (Exh. "13").    Lieutenant (now Captain)

3    Anderson recalls being asked by County HR if Plaintiff could perform his current job

4    from PCSD headquarters.[3]  *Id.* ¶ 15 & Exh. "12" at 77:13–79:3.  Ms. Kruspig also recalls

5

6    taking exception to any implication "that the interactive process was meaningfully initiated at
     that time."  CSOF ¶ 14.  In her deposition, Ms. Kruspig was asked about Plaintiff's statement:
7    "When Emily Kruspig had called me in the middle of December, she had said the Sheriff's
     Department denied my accommodation of being assigned to headquarters due to my 'inability to
8    respond to the jail in the event of a riot', because of not being able to get the vaccine."  SOF
     (Doc. 50), Exh. "13" at 52:2–8.  Ms. Kruspig confirmed the accuracy of the statement.  *Id.*, Exh.
9    "13" at 52:10–11.

10          Lieutenant (now Captain) Cindy Anderson testified:

11          There was a conversation I had with Emily about if there were any
            available positions for corrections sergeant to work at 103.  And I explained there
12          were not any positions – admin – administration building – there were not any
            positions open to be filled by a corrections sergeant.  She had asked if there's – if
13          a corrections sergeant can just be physically working there and not in one of the
            other positions, and I said, "There's no work for a corrections sergeant at the
14          administration building that isn't related to a position they're filled – that they're
            – that they're in, so if something happens at the jail, they have to go to the jail,
15          cause that's where the work is.  They can't physically be at 103 doing work for
            the jail or at the jail."
16
            So that was the conversation had about re- -- about assigning him over to
17          103 just to work there, still being under the jail umbrella as – as a corrections
            sergeant.
18

19    *Id.*, Exh. "12" at 78:1–19.  Plaintiff asserts that Lt. Anderson's earlier testimony that to her
20    knowledge no one in PCSD had looked for a reassignment position prior to December 30, 2021,
      contradicts Defendant's position.  *See* CSOF ¶ 14 & Exh. "1" at 57:24–58:3.  This testimony is
21    not inconsistent with Lt. Anderson's testimony that she spoke with Emily Kruspig informing her
      that there were no Corrections Sergeant positions available at headquarters and such a person
22    could not simply be assigned to work at headquarters because their duties would still be at the
23    jail.  *See* SOF (Doc. 50), Exh. "12" at 78:1–19.

24          [3] Plaintiff disputes this statement "to the extent it implies that a formal or documented
      inquiry was made."  CSOF (Doc. 54) ¶ 15.  The statement speaks for itself.  *See* note 3, *supra*.
25    Plaintiff's accusation that "Anderson changed her testimony[.]" is similarly without merit.  *Id.*
      Counsel asked Lt. Anderson about an e-mail written by his client regarding a discussion he had
26    with Emily Kruspig.  *See id.*, Anderson Depo. at 66:8–25 (Jan. 9, 2025) (Exh. "1"); *see also* note
      2, *supra*.  After further questioning of Lt. Anderson, Plaintiff's counsel stated, "This makes for a
27    good natural breaking point.  Let's take five, seven, somewhere around there, please."  *Id.*, Exh.
28    "1" at 77:8–10.  Following the break, counsel asked Lt. Anderson, "Is there any of your
      testimony from – so far today that you would like to amend, supplement or otherwise add to?"

1  discussing with Captain Anderson whether there were any positions available at PCSD

2  headquarters to which Plaintiff could be assigned. *Id*. ¶ 16 & Exh. "13" at 52:2–11.

3      **D.**    ***Plaintiff's Reappointment[4]***

4      Plaintiff's Corrections Sergeant position requires regular contact with vulnerable

5  populations such that there is no accommodation, short of reassignment, that would allow

6  him to do his job.[5]   SOF (Doc. 50) ¶ 17 & Letter from Cathy Bohland, Director, Pima

7  Cnty. HR Dept., to Jacob Robbins (Jan. 3, 2022) (Exh. "14") & Robbins Depo. at 33:2–8,

8  59:6–9 (Oct. 23, 2024) (Exh. "15").  The only available accommodation for Plaintiff was

9  reappointment.[6]  *Id*. ¶ 18 & Exh. "5" & Exh. "14."

10     On January 3, 2022, Plaintiff and Pima County HR began the process of searching

11  for a position to which he could be reappointed.  *See id*. ¶ 19 & Exh. "14" & *Weekly*

12  *Summaries of Available Jobs* (Exh. "16") & *Emails between Pima County HR and*

13  *Plaintiff regarding Available Jobs* (Exh. "17").   Pima County HR sent positions to

14  Plaintiff weekly from January 7, 2022, until February 25, 2022.  *See id*., Exhs. "14,"

15  "16," & "17."  In mid-January, Plaintiff contacted PCSD to ask about the reappointment

16

17  *Id*., Exh. "1" at 77:13–15.  Lt. Anderson indicated that she wanted to revisit Exhibit 6 (the e-mail
    from Plaintiff regarding his discussion with Emily Kruspig) and stated, "[I]n the conversation [I]
18  had with Emily Kruspig about whether or not, you know, he couldn't work there because there
    was a riot, that sort of thing, I don't recall making that – the comment about there's a riot and so
19  forth."  *Id*., Exh. "1" at 77:21–25.  Her testimony continues as set forth in note 2, *supra*.
20  Defendant's statement of fact speaks for itself.

21      [4] The ADA does not distinguish between "reassignment" and "reappointment."  As such,
    the terms are used interchangeably in this Report and Recommendation.

22      [5] Plaintiff disputes this statement, arguing that it misconstrues evidence.  CSOF (Doc. 54)
23  ¶ 17.  Defendant's statement refers to "Plaintiff's Corrections Sergeant position."  SOF (Doc. 50)
    ¶ 17.  This was the position that he held when he requested an accommodation.  *See* Compl.
24  (Doc. 1) ¶ 12.  Defendant's statement is consistent with the evidence.  Plaintiff's arguments do
25  not contradict Defendant's stated fact.

26      [6] Plaintiff disputes this statement asserting that it misstates or misconstrues evidence.
    CSOF (Doc. 54) ¶ 18.   This statement reflects the procedures outlined in Section IV of
27  Defendant's Admin. Proc. No. 23-29, *Reasonable Accommodation of Applicants and Employees*
    *with Disabilities*, which were communicated to Plaintiff by Ms. Bohland.  SOF (Doc. 50), Exh.
28  "5" at Section IV.B.8–9 & Exh. "6" at 1–2.  Defendant's statement is consistent with the
    evidence.  Plaintiff's arguments do not contradict Defendant's statement.

process and was told PCSD had not been contacted by Pima County HR.[7]  *Id*. ¶ 20 & E-mail from Aimee Trueblood, PCSD, to Cathy Bohland, HR Director, Pima Cnty. (Jan. 13, 2022 01:53 PM) (Exh. "19").  When Plaintiff told Pima County HR that PCSD had not been contacted, Pima County HR immediately contacted PCSD about open positions within the department.  SOF (Doc. 50) ¶ 20 & Exhs. "18," "19."

PCSD identified four (4) positions that were sent to Plaintiff.[8]  *Id*. ¶ 21 & Exh. "18."  Plaintiff expressed an interest in an opening as a 911 Dispatcher because it paid closest to his prior position.  *Id*. ¶ 22 & Exh. "15" at 113:5–19.  Plaintiff tested for the position but was unable to qualify for it.  *Id*. ¶ 23.  At this same time, Plaintiff began contacting staff at PCSD and Pima County HR inquiring regarding Sgt. Manny

---

[7] Plaintiff disputes this statement asserting that it misstates or misconstrues evidence. CSOF (Doc. 54) at ¶ 20.  Ms. Trueblood's response to Ms. Bohland states, "We have not been contacted by Carmen as of today regarding the interactive process.  I have included Lt. Anderson on this email and she will reach out to Carmen and find out where she is at with Mr. Robbins in the ADA IP."  *Id*., E-mail from Aimee Trueblood, PCSD, to Cathy Bohland, HR Director, Pima Cnty. (Jan. 13, 2022 01:53 PM) (Exh. "2") at Robbins 000092; SOF (Doc. 50), Exh. "19."  The mid-December contact between Emily Kruspig and Cpt. Christy Anderson is provided in notes 2–3, supra.  It is undisputed that Plaintiff and Pima County HR began the process of searching for a position on January 3, 2022.  CSOF (Doc. 54) ¶ 19.  Accordingly, the mid-December contact is not material.

[8] Plaintiff disputes this in part asserting that it misconstrues the evidence.  CSOF (Doc. 54) ¶ 21.  On January 14, 2022, Carmen Inocencio documented a phone conversation with Cpt. Christy Anderson, stating:

> Per email from Cathy David dated 1/13/2022, I called Lt. Anderson to inquire if the department had any permanent positions available that Mr. Robbins might be qualified for, with or without accommodation.
>
> Lt. Anderson provided these jobs and I sen[t] the list to Recruitment to confirm[] that Mr. Robbins met the MQs for each[.]
>
> * * *
>
> I forwarded the Weekly Summary to Mr. Robbins and informed him that I was working with Lt. Anderson regarding the availability of permanent positions.

CSOF (Doc. 54), Memorandum from Carmen Inocencio, Pima County HR, *Documentation of phone conversation with Lt. Christy Anderson* (Jan. 14, 2022) (Exh."5").  In deposition, Plaintiff testified, "It was implied that the Sheriff's Department knew nothing about me prior to January – prior to the middle of January, when I, when I personally contacted Christy Anderson."  *Id*., Robbins Depo. at 130:18–21 (Oct. 23, 2024) (Exh. "6").  This statement does not controvert that four (4) available positions were supplied to him from Pima County HR.

1    Hernandez, a fellow Corrections Sergeant, who had been transferred to PCSD
2    headquarters to work on a new Body Worn Camera project.  *Id*. ¶ 24 & Exhs. "18," "19."

3          At the time Plaintiff submitted his ADA paperwork, there were four positions
4    filled by Corrections Sergeants outside of the Detention Center, three (3) at PCSD
5    headquarters and one at the training center.  SOF (Doc. 50) ¶ 26 & Exh. 12 at 22:10–16
6    & Def.'s Suppl. Responses to Pl.'s 2d Set of NUI No. 19 (Exh. "20").  Corrections
7    Sergeants, like Corrections Officers, are primarily assigned to the Detention Center.[9]  *Id*.
8    ¶ 25 & Exh. "12" at 22:6–7.  The three (3) Corrections Sergeant positions at headquarters
9    included one personnel and two (2) internal affairs positions.  *Id*. ¶ 27 & Exh. "12" at
10   22:10–16 & Exh. "20."  In early 2022, PCSD created an additional Corrections Sergeant
11   position at headquarters dealing with body worn cameras that were being rolled out to
12   officers at the Detention Center.[10]  *Id*. ¶ 28 & Exh. "12" at 67:22–25.  Pima County HR
13   spoke with PCSD about Sgt. Hernandez and was told he was transferred into the Body
14   Worn Camera position based on his aptitude for the project.[11]  *Id*. ¶ 29 & Exh. "19" at

15   _____

16        [9] Plaintiff disputes this "in part," asserting that it misconstrues evidence.  CSOF (Doc.
     54) ¶ 25.  Plaintiff does not dispute that there were four (4) Corrections Sergeant positions
17   outside of the Detention Center.  *See id.* ¶ 26.  Plaintiff does not present any evidence to
     demonstrate that other than these four (4) positions—five (5) including the Body Worn Camera
18   position which was created later—Corrections Sergeants are primarily assigned to the Detention
     Center.

19        [10] Plaintiff disputes this "in part" asserting it provides contradictory evidence.  CSOF (Doc.
20   54) ¶ 28.  Plaintiff refers to Defendants' Supplemental Answers to Plaintiff's First Set of
     NUI No. 1 stating that response reflects the Body Worn Camera position was created in late
21   2021/early 2022.  *Id*.  Plaintiff's Interrogatory No. 1 states, "Identify all individuals who had
     input into the creation of the "Body Worn Camera" position and the selection of Sergeant Manny
22   Hernandez for that position, in or about late 2021."  *Id*., Defs' Suppl. Answers to Pl.'s 1st Set of
     NUI at 1 (Exh. "7").  After objections, Defendant responded, "As the second request refers to
23   Sergeant Manny Hernandez, the answer will be limited to the position to which Sgt. Hernandez
24   was assigned."  *Id*., Exh. "7" at 2.  After further objection, Defendant lists individuals who had
     input into the position.  *See id*.  Defendant does not provide any information regarding when the
25   position was created.  *See id*.  Defendant's statement does not present contradictory evidence.

26        [11] Plaintiff disputes this asserting that it misstates and misconstrues evidence.  CSOF
27   (Doc. 54) ¶ 29.  Plaintiff asserts that "[t]he only rationale provided was that Hernandez was
     'identified and selected to fulfill [the] need' internally by the department."  *Id*. ¶ 29 & E-mail
28   from Octavio Barcelo to Jacob Robbins (Feb. 1, 2022 10:51 AM) at Robbins000087 (Exh. "8").
     In the same exhibit, Octavio tells Emily Kruspig at Pima County HR:

1    Robbins 000359.

2         While Pima County HR was gathering this information, Plaintiff "follow[ed] up

3    persistently" seeking information from other Pima County HR employees regarding why

4    Sgt. Hernandez had received the Body Worn Camera position.[12]  SOF (Doc. 50) ¶30 & E-

5    mail from Jacob Robbins, via Kristen Robbins's account, to Carmen Inocencio, ADA

6    Coordinator, Pima Cnty. HR (Jan. 19, 2022 09:26 AM) (Exh. "21") (The remainder of

7    this exhibit reflects the e-mail chain responding to Plaintiff's inquiry) & *Review Boards,*

8    *Disciplinary Actions and Grievance Procedures* p.2 (Exh. "22"); CSOF (Doc. 54) ¶ 30 &

9    Exhs. "2," "8."  Plaintiff was given a general reason for Sgt. Hernandez's assignment, as

10   Pima County does not regularly discuss employment decisions, departments can make

11   assignments based on the needs of the department and the skill set of an employee.  SOF

12   (Doc. 50) ¶ 31 & Exh. "21" at Robbins 000365.  After further inquiry from Plaintiff,

13   Pima County HR informed him:

> Sgt. Hernandez is filling . . . specific needs for Sherrif's Department,
> Hernandez was identified and selected to fulfill this need, and he was
> internally reassigned to the body camera unit.  As I explained in my
> previous email to you on January 19, 2022, [t]he Sheriff's Department is
> allowed to move and reassign personnel to meet the needs of the
> Department.  Staff are not always privy to the decisions of management or
> why an employee was selected or not for an internal reassignment.  There is
> no denial of your accommodation.  Your reappointment is the offer of
> accommodation.  I hope this information helps.

---

> I don't know if I have an answer, but from my conversation with Lt. Anderson,
> Hernandez was selected by the Department after he was identified as having
> necessary skills needed by the Department for the body cam unit.  Robbins did
> not have the needed skill set required by the Dept.

*Id.*, Exh. "8" at Robbins 000087.  Defendant's statement is consistent with the evidence
presented.

[12]  Plaintiff objects to Defendant's characterizing his behavior as "hounding."
Defendant's description of Plaintiff's behavior is argumentative.  Plaintiff further disputes the
statement based upon a lack of foundation.  The e-mails speak for themselves.  The Court agrees,
however, that the page from the *Review Boards, Disciplinary Actions and Grievances
Procedures* lacks foundation for this statement.

1  *Id*. ¶ 32 & E-mail from Octavio Barcelo, PCSD, to Jacob Robbins (February 1, 2022

2  10:51 AM) (Exh. "23").

3      On February 23, 2022, Pima County HR extended Plaintiff's Medical Leave of

4  Absence until March 4, 2022, in order to continue working to find him a new position,

5  past when they would have otherwise. *Id*. ¶ 33 & E-mail and attachment from Carmen

6  Inocencio, ADA Coordinator, Pima Cnty. HR, to Jason Parrish, Deputy Dir., Pima Cnty.

7  HR (Feb. 23, 2022 11:01 AM) (Exh. "24"). On February 28, 2022, Plaintiff informed

8  Pima County HR that his salary cutoff for a new position was $24.00 per hour. *Id*. ¶ 34

9  & E-mail from Jacob Robbins via Kristen Robbins's account, to Carmen Inocencio, ADA

10  Coordinator, Pima Cnty. HR (Feb. 28, 2022 12:13 PM) (confirming salary floor) (Exh.

11  "25"). On March 8, 2022, Pima County offered Plaintiff a position as Program

12  Coordinator within the Central Human Resources Department. *Id*. ¶ 35 & E-mail from

13  Jason Parrish, Deputy Dir., Pima Cnty. HR, to Jacob Robbins (Mar. 8, 2022 05:07 PM)

14  (Exh. "26"). Later that evening, Plaintiff asked about increasing the starting salary. SOF

15  (Doc. 50) ¶ 36 & Exh. "26." The following day, Pima County HR sought and received

16  permission to reappoint Plaintiff to the Program Coordinator position with a five percent

17  (5%) raise over starting salary. *Id*. ¶ 37 & Memorandum from Cathy Bohland, Dir., Pima

18  Cnty. HR, to Jan Lesher, Acting Cnty. Adm'r (Mar. 9, 2022) (Exh. "27"). Pima County

19  HR also notified all of the proper authorities. *Ibid*. On March 10, 2022, the next day,

20  Plaintiff accepted the offer. *Id*. ¶ 38 & E-mail from Jacob Robbins to Jason Parrish,

21  Deputy Dir., Pima Cnty. HR (Mar. 10, 2022 10:27 PM) (Exh. "28").

22      On March 14, 2022, Plaintiff began work as a Program Coordinator. *Id*. ¶ 39 &

23  Exh. "28." Plaintiff was initially hired as a Program Coordinator for Occupational

24  Medicine; however, HR decided to place him in the Leave Administration Unit, which

25  had other employees available to mentor him. SOF (Doc. 50) ¶ 40 & Parrish Aff. at

26  Robbins 000129 (July 14, 2022) (Exh. "29"). Plaintiff expressed to Parrish that he was

27  pleased to work with Doreen Press, the supervisor of Leave Administration, who had

28

previously worked at PCSD and helped Robbins with his own leave request in the past.[13] *Ibid*. During his time at HR, Plaintiff regularly stopped by Parrish's office to speak about his life and job. *Id.* ¶ 41 & Exh. "29" at Robbins 000129. Mr. Parrish frequently asked Plaintiff how things were going. *Id.*, Exh. "29" at Robbins 000129. Plaintiff did not complain to Mr. Parrish about working in Human Resources or regarding Leave Administration.[14] *Ibid*. Plaintiff told another staff member that he did not intend to stay and was getting a job with the Pinal County Department of Corrections. CSOF (Doc. 50) ¶ 41 & Exh. "29" at Robbins 000130.

Plaintiff's last day in the office was March 31, 2022. *Id.* ¶ 42 & E-mail from Jacob Robbins to Doreen Press, Supervisor, Leave Admin., Pima Cnty HR, and Emily Kruspig, Nurse Liaison, Pima County HR (Apr. 5, 2022 12:50 PM) (Exh. "30") at Robbins 0001381–82. He called in sick on April 1, 2022, and then began using paid leave which the County had provided as an extension of the Families First Coronavirus Response Act. *Ibid*. On April 5, 2025, Plaintiff stated that he had a qualifying reason, filled out paperwork, and indicated that he would be out and paid with this benefit through the end of the following week, April 15, 2022. *Ibid*. Plaintiff's leave was exhausted on April 15, 2022, and he resigned the same day. SOF (Doc. 50) ¶ 43 & E-mail from Jacob Robbins to Jason Parrish, Deputy Dir., Pima Cnty. HR, and Doreen Press, Supervisor, Leave Admin., Pima Cnty. HR (Apr. 15, 2022 12:10 AM) (Exh. "31").

---

[13] Defendant's SOF No. 40 stated, "Robbins expressed to Parrish that he was pleased at this change, as the Leave Administration Unit was headed up by Doreen Press, who had worked at PCSD . . . ." Plaintiff disputed this fact to the extent it implied that he was satisfied with the accommodations process or the change in position. This is not a material issue of fact and has been omitted.

[14] Plaintiff disputes this statement in part and asserts that it misstates and/or misconstrues evidence. CSOF (Doc. 54) ¶ 41. In support of this assertion, Plaintiff cites to portions of his deposition which he confirms that "other than the fact that [he] w[as] making less than [he] had previously, there were no other issues with the job that [he] was doing at Pima County HR[.]" *Id.*, Exh. "6" at 53:11–19. Plaintiff further confirmed that while in that position people treated him appropriately. *Id.*, Exh. "6" at 53:20–24. Plaintiff did not, however, provide the transcript with his response to whether he complained to anyone about any treatment. Plaintiff has not established a disputed issue of fact.

1   Plaintiff thanked both Mr. Parrish and Ms. Press for their assistance over the previous

2   month. *Ibid*.

3       **D.    Corrections Sergeant Positions at PCSD Headquarters**

4       For positions occupied by Corrections Sergeants at PCSD headquarters, PCSD

5   does not advertise—either internally or externally; accept applications or internal interest

6   forms; interview; or hire into them directly.[15]  SOF (Doc. 50) ¶ 44 & Dominguez Aff. ¶ 6

7   (Mar. 3, 2025) (Exh. "32").  PCSD's senior management identifies individuals for, and

8   transfers them into, the positions at PCSD headquarters occupied by Corrections

9   Sergeants when senior management determines it is time for a change.[16]  *Id*. ¶ 45 & Exh.

10

---

11      [15]  Plaintiff disputes this statement, asserting that it misstates and/or misconstrues
     evidence.  CSOF (Doc. 54) ¶ 44.  Plaintiff points to Cpt. Christy Anderson's testimony regarding
12   how Corrections Sergeant positions at headquarters are filled.  *Id*. (citing to Exh. "1" at 24:12–
     25:25).  Plaintiff did not include page 25 of the Anderson deposition, either in the Court's docket
13   or in the printed binder provided to the undersigned.  Defendant attached the relevant pages to its
     Reply.  (Doc. 57, Exh. "A.")  When asked how it is decided who fills the positions of staff
14   services sergeant, training services sergeant, and internal affairs sergeants, Cpt. Anderson
     responded:
15

16          It could be done a few different ways.  We have competitive reassignment
            processes where it can – the lieutenant, captain, that – that chain can decide,
17          "Let's open it up for a competitive reassignment," meaning we open it up to – if
            it's a corrections sergeant position, we open it up to all corrections sergeants to
18          put in for, and it's a competitive reassignment.  It's not – it has nothing to do with
            pay, has nothing to do with seniority or tenure or – a promotion.  It's nothing like
19          that.  It's just a reassignment.  So that is one way of doing it.

20          Another way is that we just reassign based on the need, and if we identify
            that there's somebody in particular that we want, that move happens just – just as
21          that, a – a transfer happens, a reassignment happens.  We're like, "Okay, we want
            this person over here," so they're replacing this person, this person's going to go
22          over there.  It happens all the time.
23
     Reply (Doc. 57), Exh. "A" 24:23–25:15.  When asked how the department chooses a competitive
24   reassignment versus individual identification, Cpt. Anderson testified that there is no procedure,
     it is based upon the lieutenant or captains discretion.  *Id*., Exh. "A" at 25:16–25.  The fact that
25   these positions can be filled by a competitive process is not material to whether a position was
     vacant in this case.
26

27      [16]  Plaintiff disputes this statement "in part," asserting that it misstates and/or
     misconstrues evidence.  Captain Anderson's testimony reflects that how the headquarters
28   Correction Sergeant positions are filled is up to senior and executive command staff.  *See* note
     15, *supra*.

"32" ¶ 8 & Dominguez Aff. at Robbins 000125 (July 15, 2022) (Exh. "33").    The positions at PCSD headquarters occupied by Corrections Sergeants do not have set terms nor are there policies or procedures for when or how those positions will be filled.    *Id*. ¶ 46 & Exh. "32" at ¶ 7.    The decision of when, how, and who to place in the positions at PCSD headquarters occupied by Corrections Sergeants are made by senior and executive command staff based on what is best for PCSD's operations.[17]    *Id*. ¶ 47 & Exh. "32" ¶ 9 & Exh. "12" at 73:18–74:16.

In December 2021, the Body Worn Camera position did not exist, and the internal affairs and personnel positions were already occupied.[18]    SOF (Doc. 50) ¶ 48 & Exh. "15" at 104:12–105:1.    The Body Worn Camera position was created and filled in late 2021/early 2022 when PCSD realized the benefit of having a corrections sergeant involved in the rollout of body worn cameras to corrections officers.[19]    SOF (Doc. 50) ¶ 49 & *Pima County's Suppl. Answer to NUI No. 2* (Exh. "34").    Manny Hernandez, the Corrections Sergeant placed in the body Worn Camera position was, like Plaintiff, unable to get the COVID vaccine due to a medical condition.[20]    SOF (Doc. 50) ¶ 50 & Exh. "15"

---

[17]    Plaintiff disputes this statement "in part," asserting that it misstates and/or misconstrues evidence.    For the reasons stated in note 15 & 16, *supra*, the Court finds Defendant's statement of fact is consistent with the evidence.

[18]    Plaintiff disputes this statement, asserting that it misstates and/or misconstrues evidence.    For the reasons stated in note 10, *supra*, the Defendant did not present contradictory evidence.

[19]    Plaintiff disputes this statement in part.    CSOF (Doc. 54) ¶ 49.    After objection, Defendant's response to NUI No. 2 states:

> [T]he Body Worn Camera Position was created as a part of evolving discussions regarding implementing body worn cameras into the jail's operating procedures in late 2021.    Because the Department did not solicit applications or conduct an[] interview process, there is not a specific date on which the position was created and it was never "open and available" to be filled, as Sgt. Hernandez was assigned to the position in conjunction with the final decision to create the position.

SOF (Doc. 50), Exh. "34."    It is undisputed that Sgt. Hernandez was not hired into the position until early January 2022.    CSOF (Doc. 54) at ¶ 92.    Defendant did not present contradictory evidence.

[20]    Plaintiff disputes this fact "in part," asserting that it misconstrues evidence.    CSOF (Doc. 54) ¶ 50.    Plaintiff disputes that Manny Hernandez had a pending ADA accommodation

1    at 118:17–119:2 & Doctor's Note Re: Manny Hernandez (Dec. 15, 2021) (Exh. "35").

2    **E.    The Current Litigation**

3    During his deposition, Plaintiff admitted that the vaccine mandate and its effect on

4    him were not discriminatory.[21]  SOF (Doc. 50) ¶ 51 & Robbins Depo. at 33:2–8 (Oct. 23,

5    2025) (Exh. "15").  Plaintiff resigned his employment with Pima County.[22]  *Id*. ¶ 52 &

6    Exh. "31."  Pima County has procedures in place for employees subject to adverse

7    employment decisions to follow, such as filing a grievance.[23]  SOF (Doc. 50) ¶ 53 &

8    PCSD Gen. Order 2023-004, *Chapter 6—Review Boards, Disciplinary Actions and*

9    *Grievance Procedures, Section XII Grievance and Appeals Procedures* at Robbins

10   001225–001227 (Exh. "36").

11   Plaintiff brings this cause of action based on allegations of discrimination in

12   violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of

13   1973.  Plaintiff also seeks redress pursuant to Section 1983, Title 42, United States Code,

14   for discriminatory and retaliatory conduct in violation of his Equal Protection rights and a

15   deprivation of his Due Process property interest in continued employment.  *See* Compl.

16   (Doc. 1).  Plaintiff's Charges of Discrimination before the EEOC and Arizona Civil

---

request when he was reassigned.  *Id*.  Emily Kruspig testified that based on her review, Sgt. Hernandez did not go through the ADA accommodation process.  *Id*., Exh. "4" at 65:1–5.  It is undisputed, however, that for those with a medical condition that prevented them from getting the COVID-19 vaccine, Pima County would follow Administrative Procedure 23-29.  SOF (Doc. 50) ¶ 8; CSOF (Doc. 54) ¶ 8.  As such, Plaintiff's distinction is not material.

[21] Plaintiff disputes this fact, asserting it misstates and misconstrues evidence.  CSOF (Doc. 54) ¶ 51.  Plaintiff's argument is unsupported by the portions of his deposition to which he cites.  *See id*., Exh. "6" at 116:24–117:5 (stating Plaintiff did not know why Sgt. Hernandez was placed at headquarters).  Defendant did not misstate or misconstrue the evidence.

[22] Plaintiff disputes this statement, asserting it misstates and/or misconstrues evidence and makes a legal conclusion.  CSOF (Doc. 54) ¶ 52.  To the extent "voluntarily" implies a legal conclusion, Plaintiff's objection is well-taken; however, it is undisputed that Plaintiff's resignation e-mail was not requested by anyone from Pima County.  *See id.* ¶ 43.

[23] Plaintiff disputes this statement "in part," asserting that it misconstrues evidence.  CSOF (Doc. 54) ¶ 53.  Plaintiff's feelings about prior grievance experiences are immaterial to the fact that a procedure exists.  Defendant's statement does not misconstrue the evidence.

1    Rights Division ("ACRD") do not include a retaliation claim.[24]  SOF (Doc. 50) ¶ 54 &

2    *ACRD Employment Charge of Discrimination* (Exh. "37") & *EEOC Form 5—Charge of*

3    *Discrimination* (Apr. 27, 2022) (Exh. "38").

4

5    **III.    ANALYSIS**

6        ***A.    Americans with Disabilities Act and the Rehabilitation Act***

7        Defendant asserts that Plaintiff did not suffer employment discrimination under

8    the Americans with Disabilities Act ("ADA") and the Rehabilitation Act because he was

9    reasonably accommodated.  Def.'s Mot. for Summ. J. (Doc. 49) at 8–12.  Plaintiff urges

10   that he has "brought forth genuine issues of material fact as to . . . his Discrimination

11   claims."  Pl.'s Response (Doc. 53) at 9.

12       **1.  Legal Standards—Overview**

13       "The ADA contains five titles separately addressing employment, public entities,

14   public accommodations, telecommunications, and miscellaneous matters."  *Stanley v.*

15   *City of Sandford, Fla.*, 606 U.S. 46, 51 (2025) (citing 104 Stat. 327–328).  Title I of the

16   ADA prohibits an employer from "discriminat[ing] against a qualified individual on the

17   basis of disability."  42 U.S.C. § 12112(a).  The ADA defines a "qualified individual" as

18   "an individual who, with or without reasonable accommodation, can perform the

19   essential functions of the employment position that such a person holds or desires."  42

20   U.S.C. § 12111(8).  The ADA mandates that "discrimination" includes an employer "not

21   making reasonable accommodations to the known physical or mental limitations of an

22   otherwise qualified . . . employee [with a disability], unless [the employer] . . . can

23   demonstrate that the accommodation would impose an undue hardship on [its]

24   operation[.]"  42 U.S.C. § 12112(b)(5)(A).  A "reasonable accommodation" under the

25   ADA may include "reassignment to a vacant position[.]"  42 U.S.C. § 12111(9)(B).

26   _____

27       [24] Plaintiff disputes this statement "in part"; however, he concedes that he did not check
     the box for retaliation.  CSOF (Doc. 54) ¶ 54.  Furthermore, the narrative sections, upon which
28   he also relies, reasonably state a discrimination claim, but do not suggest retaliation claim.  *See*
     SOF (Doc. 50), Exhs. "37," "38."

1    "The Rehabilitation Act of 1973, 29 U.S.C. §§ 701–794 (1975 & Supp. 1983), was

2    initially intended primarily to help states develop and implement vocational rehabilitation

3    services for handicapped persons." *Boyd v. United States Postal Service*, 752 F.2d 410,

4    412 (9th Cir. 1985). "It was later amended to provide more comprehensive protection for

5    [disabled] persons subjected to discriminatory treatment." *Id*. (citing 29 U.S.C. § 701

6    (1975 & Supp. 1983)). In its current form, the Rehabilitation Act provides "the standards

7    applied under title I of the Americans with Disabilities Act of 1990 [("ADA")] (42

8    U.S.C. 1211 et seq.) and the provisions of sections 501 through 504, and 510, of the

9    [ADA (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment[,]"

10   are to be used in resolving Rehabilitation Act employment discrimination claims. 29

11   U.S.C. § 791(f) (2014).

12         In order to state a prima facie case of failure to accommodate under the ADA,

13   Plaintiff must show: (1) he is disabled within the meaning of the ADA and Rehabilitation

14   Act; (2) he is a qualified individual able to perform the essential functions of the job, with

15   or without accommodation; and (3) he suffered an adverse employment action because of

16   his disability. *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir.

17   2012); *Wong v. regents of Univ. of Cal.*, 410 F.3d 1052, 1058 (9th Cir. 2005) (citations

18   omitted) (outlining the *prima facie* case of disability discrimination under the ADA and

19   Rehabilitation Act as it applies to entities that receive federal funding and requiring a

20   fourth step—showing his employer "receives federal financial assistance (for the

21   Rehabilitation Act claim) or is a public entity (for the ADA claim)."); *see also* 42 U.S.C.

22   § 12112(a); *Kennedy v. Applause, Inc*. 90 F.3d 1477, 1481 (9th Cir. 1996) (delineating

23   elements of an ADA discrimination claim).

24              **2. Factor 1—Disability**

25         It is undisputed that Plaintiff qualifies as an individual with a disability under the

26   ADA. SOF (Doc. 50) ¶ 3; CSOF (Doc. 54) ¶ 56. As such, the Court need not further

27   analyze this factor.

28   . . .

### 3. <u>Factor 2—Qualified Individual</u>

As stated, *supra*, to be protected under the ADA, Plaintiff bears the burden to show that he is a qualified individual able to perform the essential functions of the job, with or without accommodation. 42 U.S.C. § 12111(8); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012). Congress delegated authority to implement Title I of the ADA to the Equal Employment Opportunity Commission ("EEOC"). *See* 42 U.S.C. § 12116. Accordingly, the EEOC has promulgated regulations expanding the definition of qualified individual. *See* Equal Employment for Individuals with Disabilities, 56 Fed. Reg. 35,726, 35,735 (July 26, 1991); *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1127 (9th Cir. 2020) (citing *Johnson v. Board of Trs. of Boundary Cnty. Sch. Dist. No. 101*, 666 F.3d 561, 564–65 (9th Cir. 2011)). The EEOC regulation defines "'qualified,' with respect to an individual with a disability, [to] mean[] that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires ***and***, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m) (emphasis added); *see also Anthony*, 955 F.3d at 1127. The Ninth Circuit has adopted this two-part inquiry—"[t]he court first examines whether the individual satisfies the requisite skill, experience, education, and other job-related requirements of the position"; and second, "the plaintiff must establish that []he can perform those functions with or without reasonable accommodations." *Samper*, 675 F.3d at 1240 (citations omitted); *see also Anthony*, 955 F.3d at 1128; *Johnson*, 666 F.3d at 565.

#### a. Skill, experience, education, and other job-related requirements of the position

It is undisputed that Plaintiff possessed the requisite skill, experience, education, and other job-related requirements of the Corrections Sergeant assigned to the detention center prior to the October 21, 2021, memorandum from County Administrator Huckelberry. SOF ¶¶ 1, 2. Following County Administrator Huckelberry's

memorandum and that of the Board of Supervisors, an additional job-related requirement was added to Plaintiff's position—to be vaccinated against COVID-19 by January 1, 2022. *Id*. ¶¶ 4–6.  It is undisputed this additional requirement made it impossible for Plaintiff to continue in his current position as a Corrections Sergeant assigned to the detention center working with a vulnerable population. *Id*. ¶ 17; *see Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1129 (9th Cir. 2020) (quoting 29 C.F.R. pt. 1630, app. to § 1630.2(m)) (emphasis in original) ("The determination of whether an individual with a disability is qualified is to be made *at the time of the employment decision*.").  As such, he was no longer qualified for this position.

The Ninth Circuit has observed "that the first step of the qualification inquiry, unlike the second step, contains no reference to reasonable accommodation." *Johnson*, 666 F.3d at 565.  The court went on to posit that "[i]f the EEOC had intended to require employers to provide reasonable accommodation to ensure that disabled individuals can satisfy the job prerequisites, in addition to the essential job functions, it presumably could have said so in the regulation[,] [and] [t]hat the EEOC declined to include any reference to reasonable accommodation in the first step suggests that such omission was deliberate." *Id*. (citing *Fedorenko v. United States*, 449 U.S. 490, 512 (1981)). Therefore, "unless a disabled individual independently satisfies the job prerequisites, []he is not 'otherwise qualified,' and the employer is not obligated to furnish any reasonable accommodation that would enable [him] to perform the essential job functions." *Id*. at 565–66; *see Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481–82 (9th Cir. 1996) (total disability prevented plaintiff from being able to perform her job and court did not need to consider accommodation); *Samper*, 675 F.3d at 1240–41 (employee could not perform essential functions of NICU nurse and employer was not obligated to accommodate).

Thus, "[i]n most cases, the essential function and reasonable accommodation analyses are separate[.]" *Samper*, 675 F.3d at 1240.  The Ninth Circuit has further observed that in the context of a facial challenge to a qualification standard, "it would make little sense to require an ADA plaintiff to show that he meets a qualification

standard that he undisputed *cannot* meet because of his disability and that forms the very basis of his discrimination challenge." *Johnson*, 666 F3d at 566–67 (quotations and citations omitted). In a facial challenge, "[i]f the employee succeeds in showing that the qualification standard has the effect of discriminating on the basis of disability, the burden then shifts to the employer to show that the qualification standard is (1) job-related, (2) consistent with business necessity, and (3) that performance cannot be accomplished by reasonable accommodation." *Id.* at 567 (internal quotation and citations omitted); *see also* 42. U.S.C. § 12113(a). "Here, however, [Robbins] does not challenge . . . [Pima County's vaccination] requirement as a discriminatory job prerequisite." *Johnson*, 666 F.3d at 567. "Rather, the basis for [Plaintiff's] discrimination claim is the [County's] failure to accommodate [his] disability, which is analytically distinct from a claim of disparate treatment or impact under the ADA." *Id.* (citing *McGary v. City of Portland*, 386 F.3d 1259, 1265–66 (9th Cir. 2004)).

Properly, summary judgment should be granted in favor of Defendant because it was impossible for Plaintiff to work in his current position, and as a result, he was no longer a qualified individual under the ADA. *See Anthony*, 955 F.3d at 1129. The parties, however, have treated this case as one for a failure to accommodate. Furthermore, it is undisputed that Pima County adopted procedures for accommodating employees who could not be vaccinated due to medical issues. Accordingly, the Court will analyze the reasonable accommodation step of the two-step inquiry. *Contra Anthony*

### b. Reasonable Accommodation

#### i. *Legal Standards*

Under the ADA, "[t]he term 'reasonable accommodation' may include . . . reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). "Reassignment is the reasonable accommodation of last resort and is required only after it has been determined that (1) there are no effective accommodations that will enable the employee to perform the essential functions of his/her current position, or (2) all other reasonable accommodations would impose an undue hardship." EEOC, EEOC-CVG-2003-1,

Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA (Oct. 17, 2002) at 40 (citing 29 C.F.R. 1630 app. § 1630.2(o)). "Whether an accommodation is reasonable 'depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the [potential] accommodations." *Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 799 (9th Cir. 2017) (alterations in original) (quoting *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010)).

"Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations that will enable the employee to perform [his] job duties." *Id.* (internal quotations and citations omitted); *Dark v. Curry County*, 451 F.3d 1078, 1088 (9th Cir. 2006); *see also Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1134 (9th Cir. 2020). "The interactive process requires: (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *Zivkovic v. Southern Cal. Edison, Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (citations omitted). "An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Id.* (citations omitted). The position must be vacant or will become vacant within a reasonable period of time. *Dark v. Curry Cnty.*, 451 F.3d 1078, 1089–90 (9th Cir. 2006). Furthermore, "the ADA does not impose a duty to create a new position to accommodate a disabled employee." *Wellington v. Lyon Cnty. Sch. Dist.*, 187 F.3d 1150, 1155 (9th Cir. 1999) (citations omitted). Nor does the ADA require an employer to promote a disabled employee as an accommodation. *See* 29 C.F.R. § 1630.2(o); *see also Martin v. Lockheed Martin Missiles and Space Co.*, 187 F.3d 648, at *2 (9th Cir. 1999) (unpublished) (citations omitted). Finally, the ADA does not require an employer to "bump" another employee from a position in order to create a vacancy. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 409

1    (2002) (O'Connor, J. concurring) (citations omitted).

2                        *ii.    Interactive Process*

3           It is undisputed that on November 5, 2021, Plaintiff called Pima County HR

4    requesting information about the ADA accommodations process, and papers to self-

5    report the need for an accommodation were sent to him that same day.  SOF (Doc. 50) ¶

6    10.  On December 15, 2021, Plaintiff faxed his completed medical inquiry form stating

7    that he was medically unable to receive the COVID-19 vaccine to Pima County HR.  *Id*. ¶

8    12.  The following day, the ADA panel found Plaintiff eligible for workplace

9    accommodations and soon after initiated the interactive process with PCSD to determine

10   what accommodations might be appropriate.  *Id*. ¶ 13.  On January 3, 2022, Plaintiff and

11   Pima County HR began the process of searching for a position to which he could be

12   reappointed.  *Id*. ¶ 19.  Pima County HR sent positions to Plaintiff weekly from January

13   7, 2022 until February 25, 2022.  *Ibid*.

14          In mid-January, Plaintiff contacted PCSD to ask about the reappointment process

15   and was told PCSD had not been contacted by Pima County HR.  SOF (Doc. 50) ¶ 20.

16   Plaintiff informed Pima County HR that PCSD had not been contacted; Pima County HR

17   immediately contacted PCSD about open positions within the department.  *Id*.  PCSD

18   identified four (4) positions that were sent to Plaintiff.  *Id*. ¶ 21.  Plaintiff expressed an

19   interest in an opening as a 911 Dispatcher because it paid closest to his prior position;

20   however, he was unable to qualify.  *Id*. ¶¶ 22–23.  At this same time, Plaintiff began

21   contacting staff at PCSD and Pima County HR inquiring regarding Sgt. Manny

22   Hernandez, a fellow Corrections Sergeant, who had been transferred to PCSD

23   headquarters to work on a new Body Worn Camera project.  *Id.* ¶ 24.

24          On February 23, 2022, Pima County HR extended Plaintiff's Medical Leave of

25   Absence until March 4, 2022, in order to continue working to find him a new position,

26   past when they would have otherwise.  SOF (Doc. 50) ¶ 33.  On February 28, 2022,

27   Plaintiff informed Pima County HR of his salary requirements.  *Id*. ¶ 34.  On March 8,

28   2022, Pima County offered Plaintiff a position as Program Coordinator within the Central

1    Human Resources Department.  *Id.* ¶ 35.  Plaintiff asked about increasing the starting
2    salary, the County granted a five percent (5%) increase over starting, and Plaintiff
3    accepted.  *Id.* ¶ 38.  On March 14, 2022, Plaintiff began work as a Program Coordinator.
4    *Id.* ¶ 39.

5    Plaintiff raises several issues regarding this process, which the Court will address
6    in turn.

7                    iii.    *Proximity Between Protected Activity and Refusal to*
8                            *Accommodate*

9    Plaintiff asserts that his "October 2021 grievance was followed within weeks by
10   Defendant's inaction on his accommodation, exclusion from reassignment, and later
11   denial of rehire – support an inference of discriminatory motive."  Response (Doc. 53) at
12   10.  Plaintiff's assertions are without merit.

13   As an initial matter, there were nine (9) business days between the approval of
14   Plaintiff's request for a workplace accommodation and the beginning of the interactive
15   process.  SOF ¶¶ 13, 19.  Furthermore, this time period encompassed the Christmas and
16   New Year's holidays.  *See id.*  It is presumed that no one took any vacation time.  Nine
17   (9) business days does not equate to inaction on his accommodation claim.

18   Moreover, Plaintiff did not make either a retaliation claim or a failure to rehire
19   claim in his Complaint (Doc. 1) or before the EEOC.  SOF ¶ 54.  "Title VII directs that a
20   'charge . . . shall be filed' with the EEOC 'by or on behalf of a person claiming to be
21   aggrieved' within 180 days 'after the alleged unlawful employment practice occur[s.]'"
22   *Fort Bend Cnty., Tex. v. Davis*, 587 U.S. 541, 544 (2019) (quoting 42 U.S.C. § 2000e-
23   5(b), (e)(1)).  "Title I [of the ADA] . . . incorporates Title VII's charge requirement[.]"
24   *Zimmerman v. Oregon Dep't of Just.*, 170 F.3d 1169, 1178 (9th Cir. 1999); *see* 42 U.S.C.
25   § 12117(a).  Title VII's charge-filing requirement is a mandatory processing rule.  *Fort*
26   *Bend Cnty., Tex.*, 587 U.S. at 551.  Additionally, the scope of a Title I "claimant's court
27   action depends upon the scope of both the EEOC charge and the EEOC investigation."
28   *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990).  Defendant properly objects to any

attempt to add these claims through a responsive filing.  *See* Reply (Doc. 57) at 8–9.

Finally, the Court will address Plaintiff's argument that he "excluded" from reassignment below.

### iv.    *Prompt Engagement in the Interactive Process*

Plaintiff asserts that "Defendant's complete failure to take any action during December 2021 to process Plaintiff's ADA accommodation—despite having approved his eligibility on December 16—strongly supports a claim of discrimination."  Response (Doc. 53) at 10.  Plaintiff's argument is without merit.

As stated in the previous section, there were nine (9) business days between the approval of Plaintiff's request for a workplace accommodation and the beginning of the interactive process.  SOF ¶¶ 13, 19.  Furthermore, this time period encompassed the Christmas and New Year's holidays.  *See id.*  It is presumed that no one took any vacation time.  Nine (9) business days does not equate to inaction on his accommodation claim.  Additionally, a telephone conversation took place between Emily Kruspig of Pima County HR and Cpt. Christy Anderson at some point in mid-December.  *Id*. ¶ 14.  Ms. Kruspig inquired about assigning Plaintiff to headquarters, but Ms. Anderson explained there were not any positions open for a corrections sergeant, and that he would not be able to fulfill his then current responsibilities at the detention center from headquarters. *Id*., Exh. "12" at 78:1–19.  Although this conversation is not material to the beginning of the interactive process, it is some evidence that Defendant was seeking information regarding possible accommodations.

### v.    *Failure to Consider Plaintiff for Headquarters Position*

Plaintiff asserts that "Defendant cannot excuse its failure to consider Plaintiff for the Body Worn Camera (BWC) position or Personnel by asserting those positions were internally filled or not publicly posted."  Response (Doc. 53) at 10–11.  Defendant does not need to "excuse its failure" because it was not required to offer Plaintiff those positions.

The ADA only requires "reassignment to a ***vacant*** position."    42 U.S.C. §

12111(9)(B) (emphasis added).  In contemplating the effect of a seniority system on a reassignment under the ADA, Justice O'Connor observed, "[t]he work 'vacant' means 'not filled or occupied by an incumbent [or] possessor.'"  *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 409 (2002) (O'Connor, J. concurring) (quoting Webster's Third New Int'l Dictionary 2527 (1976)).  "In the context of a workplace, a vacant position is a position in which no employee currently works and to which no individual has a legal entitlement."  *Id*.  Justice O'Connor provided the following example:

> [I]n a workplace without a seniority system, when an employee ceases working for the employer, the employee's former position is vacant until a replacement is hired.  Even if the replacement does not start work immediately, once the replacement enters into a contractual agreement with the employer, the position is no longer vacant because it has a "possessor." In contrast, when an employee ceases working in a workplace with a legally enforceable seniority system, the employee's former position does not become vacant if the seniority system entitles another employee to it. Instead, the employee entitled to the position under the seniority system immediately becomes the new 'possessor' of that position.

*Id*.  Justice O'Connor reiterated, "Congress did not intend reasonable accommodation to require bumping other employees."  *Id*. (citations omitted).  Although the instant case does not involve a seniority system, Justice O'Connor's example is instructive.

PCSD's senior management identifies individuals for, and transfers them into the positions at PCSD headquarters occupied by Corrections Sergeants when senior management determines it is time for a change.  SOF (Doc. 50) ¶ 45.  The headquarters Corrections Sergeant positions do not have set terms nor are there policies or procedures for when or how to fill them.  *Id*. ¶ 46.  These decisions are made by senior and executive command staff based on what is best for PCSD's operations.  *Id*. ¶ 47.

At the time Plaintiff submitted his ADA paperwork, there were four positions filled by Corrections Sergeants outside of the Detention Center, three (3) at PCSD headquarters and one at the training center.  *Id*. ¶ 26.  The three (3) Corrections Sergeant positions at headquarters included one personnel and two (2) internal affairs positions. *Id*. ¶ 27.  In December 2021, the Body Worn Camera position did not exist, and the

internal affairs and personnel positions were already occupied.  SOF (Doc. 50) ¶ 48.

The Body Worn Camera position did not exist until early January 2022.  Although the PCSD senior command staff may have been discussing the idea in December 2021, the evidence demonstrates that "Sgt. Hernandez was assigned to the position in conjunction with the final decision to create the position."  *Id.*, Exh. "34" (Defendant's response to NUI No. 2).  It is undisputed that Sgt. Hernandez was not hired into the position until early January 2022.  CSOF (Doc. 54) at ¶ 92.  Furthermore, it is undisputed that Sgt. Hernandez was unable to receive the COVID vaccine due to a medical condition.  SOF (Doc. 50) ¶ 50.  At oral argument, counsel urged that Sgt. Hernandez did not have an ADA claim, but rather was seeking an accommodation under Pima County's policy.  This is a distinction without a difference.  Counsel also suggested that Plaintiff filed his accommodation paperwork first, implying that he should have had access to the Body Worn Camera position before Sgt. Hernandez.  The ADA does not give a hierarchy of disabilities nor does it espouse a "first in time, first in right" priority principle.  As such, Plaintiff did not possess a "superior" right to an accommodation.  "Whether an accommodation is reasonable 'depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the [potential] accommodations."  *Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 799 (9th Cir. 2017) (alterations in original) (quoting *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010)).

The ADA "seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions and the hostile reactions that far too often bar those with disabilities from participating fulling in the Nation's life, including the workplace."  *U.S. Airways*, 535 U.S. at 1522–23.  "These objectives demand unprejudiced thought and reasonable responsive reaction on the part of employers . . . [t]hey do not, however, demand action beyond the realm of the reasonable."  *Id.* at 1523.  Plaintiff's demand for a position that did not exist, which was then created for another co-worker who required a similar medical accommodation as Plaintiff, is not reasonable.  Plaintiff has failed to

show that the Body Worn Camera position was vacant.

In February, the Corrections Sergeant in personnel changed over. CSOF (Doc. 54), Exh. "1" at 27:14–28:22. The Corrections Sergeant who replaced the outgoing Sergeant was identified and began work in the position on February 2, 2022, prior to the outgoing Sergeant's last day, February 17, 2022. *Id*., Exh. "1" at 28:13–22. The record does not reflect when the new Sergeant was identified. As a result, Plaintiff has not identified evidence in the record that this position was "vacant" as required by the ADA, and necessary to refute Defendant's contention to the contrary. The record shows this position was never "vacant"—it was occupied by a possessor and not available to be filled. As such, Plaintiff cannot meet his burden to show that accommodation seems reasonable on its face.[25] *See U.S. Airways*, 535 U.S. at 401.

Defendant asserts that the personnel decisions made by senior and executive Command Staff are based on what is best for PCSD's operations and considered fundamental governmental policy under Arizona law. *See* Def.'s Mot. for Summ. J. (Doc. 49) at 11) (citing A.R.S. § 12-820.01(B)(2)) ("The determination of a fundamental governmental policy involves the exercise of discretion and shall include, but is not limited to . . . [a] determination of whether and how to spend existing resources, including those allocated for equipment, facilities and personnel."). Moreover, Defendant was not required to "bump" another employee from the position in order to create a vacancy. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 409 (2002) (O'Connor, J. concurring) (citations omitted). The Court finds there were no vacant positions in headquarters available to Plaintiff for reassignment.

vi.    *Plaintiff received a reasonable accommodation*

Defendant Pima County communicated with Robbins to explore possible

_____

[25] Plaintiff's response contains only passing reference to the "Personnel" position. Pl.'s Response (Doc. 53) at 6, 10. Speculation is insufficient to defeat summary judgment. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1075) (citations omitted) (recognizing "mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

accommodations. It extended his leave to allow additional time to find an available position. *See Dark v. curry County*, 451 F.3d 1078, 1090 (9th Cir. 2006) (recognizing unpaid medical leave or an extension of an existing leave period may be a reasonable accommodation). The evidence supports that Defendant's efforts were made in good faith and it considered Plaintiff's request. Finally, it offered Plaintiff a position, which he accepted. "The reassignment was a reasonable accommodation because no accommodation would allow [Robbins] to perform the essential functions of the [Corrections Sergeant] position, and there were no vacant equivalent position to which [Pima County] could reassign [Robbins]." *Reza v. Int'l Game Tech.*, 351 Fed. App'x 188 (9th Cir. 2009) (citing 42 U.S.C. § 12111(9)(B); then citing *Dark*, 451 F.3d at 1089); then citing 29 C.F.R. pt. 1630, app. § 1630.2(o)).

### 4. Factor 3—Adverse Employment Action

Plaintiff cannot demonstrate that he suffered an adverse employment action. Plaintiff was reassigned to the Program Coordinator position within the Central Human Resources Department. SOF (Doc. 50) at ¶¶ 35–38. On March 14, 2022, he began work as a Program Coordinator. *Id.* ¶ 39. He was initially hired as a Program Coordinator for Occupational Medicine, but HR decided to place him in the Leave Administration Unit, which had other employees available to mentor him. *Id.* ¶ 40. Plaintiff did not complain to any HR staff about working in Human Resources or regarding Leave Administration. *Id.* ¶ 41. Plaintiff's last day in the office was March 31, 2022. *Id.* ¶ 42. Upon exhausting his leave on April 15, 2022, Plaintiff tendered his resignation. SOF (Doc. 50) at ¶ 43.

To the extent that Plaintiff has made a claim for constructive discharge, it must fail. "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). To establish a claim for constructive discharge "[a] plaintiff must prove first that he was discriminated against by

his employer to the point where a reasonable person in his position would have felt compelled to resign[,] . . . [b]ut he must also show that he actually resigned.  *Id.* (citations omitted).  "The whole point of allowing an employee to claim 'constructive' discharge is that in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him."  *Id.* at 560 (citing *Suders,* 542 U.S. at 141–143).  Here, there is no evidence to support a finding that Plaintiff was discriminated, let alone to such a degree that he felt compelled to resign.  Plaintiff's resignation was the result of personal choice, not discrimination.

### 5.  Conclusion

Plaintiff has failed to meet his burden to establish a prima facie case of discrimination under the ADA or the Rehabilitation Act.  Accordingly, it is recommended that summary judgment on Plaintiff's ADA/Rehabilitation Act claims be granted.

### B.    Equal Protection

Defendant asserts that "Plaintiff fails to show Pima County was motivated by discriminatory intent in treating Plaintiff differently from similarly situated employees or to identify a similarly situated individual who was treated differently than he."  Def.'s Mot. for Summ. J. (Doc. 49) at 13.  Plaintiff asserts that he is entitled to "proceed under a 'class-of-one' theory by showing that his differential treatment was arbitrary or based on personal animus."  Response (Doc. 53) at 16 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Plaintiff further asserts that he "was the only former PCSD employee not rehired over a three-year period, despite requesting return in similar circumstances to at least six other employees who resigned or were terminated due to vaccine noncompliance."  *Id.*  Plaintiff's claim is without merit.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell v. Dept. of Soc. Services of New York*, 436 U.S. 658, 694 (1978).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §

1983." *Monell*, 436 U.S. at 694. The Fourteenth Amendment to the United States Constitution provides that no state shall "deny any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV § 1. The Supreme Court of the United States has observed that its "equal protection jurisprudence has typically been concerned with governmental classifications that affect some groups of citizens differently than others." *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 601 (2008) (quotations and citations omitted). "[T]he class-of-one theory of equal protection[,] . . . presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review." *Id.* at 605. This "is simply a poor fit in the public employment context." *Id.* "To treat employees differently is not to classify them in a way that raises equal protection concerns[;] [r]ather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Id.* The Supreme Court's conclusion that "the class-of-one theory of equal protection has no application in the public employment context" is based on the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.* at 606 (quoting *Connick v. Meyers*, 461U.S. 138, 143 (1983)).

Here, Plaintiff's Complaint states "Defendants' discriminatory and retaliatory conduct violated Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment." (Doc. 1 ¶ 73). The Complaint is devoid of facts to suggest a failure to rehire or retaliation. Plaintiff cannot seek to add claims at this juncture. Moreover, Plaintiff cannot establish a class-of-one equal protection claim because such a theory "has no application in the public employment context." *Engquist*, 553 U.S. at 606. Accordingly, it is recommended that Defendant be granted summary judgment on Plaintiff's equal protection claim.

### C.    Due Process

Defendant seeks summary judgment on Plaintiff's due process claim. Def.'s Mot. for Summ. J. (Doc. 49) at 14. Plaintiff's Complaint asserts that he "had a Fourth

1    Amendment due process 'property right' to his job (continued employment), but his job

2    was taken away from him without the opportunity to appeal that job loss or have a due

3    process evidentiary hearing on the job loss, and thus his job was taken in violation of his

4    federal constitutional right to due process." (Doc. 1 ¶ 77). In response to Defendant's

5    motion, Plaintiff claims not only did he have a property interest "in continued public

6    employment with access to CORP retirement benefits[,]" but also that he "had a liberty

7    interest in avoiding reputational stigma that could foreclose future employment

8    opportunities." Response (Doc. 53) at 17.

9         Due Process "requires 'some kind of hearing' prior to the discharge of an

10   employee who has a constitutionally protected property interest in his employment."

11   *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citing *Board of Regents

12   of State Colleges v. Roth*, 408 U.S. 564, 569–70 (1972); then citing *Perry v. Sindermann*,

13   408 U.S. 593, 599 (1972)). "[T]he requirements of due process do not apply[, however,]

14   unless [Plaintiff] can first show that [he] has a cognizable liberty or property interest[.]"

15   *Dorfmont v. Brown*, 913 F.2d 1399, 1403 (9th Cir. 1990) (citing *Roth*, 408 U.S. at 571).

16   "Property interests . . . are not created by the Constitution[;] [r]ather[,] they are created

17   and their dimensions are defined by existing rules or understandings that stem from an

18   independent source[.]" *Roth*, 408 U.S. at 577. "Where there is no right, no process is

19   due under the Constitution." *Dorfmont*, 913 F.2d at 1403 (citations omitted).

20        Here, Plaintiff did not have a constitutionally protected property interest in his

21   employment because he resigned. As discussed, *supra*, Plaintiff was not constructively

22   discharged and cannot produce any evidence to demonstrate that he was deprived of a

23   property interest. Rather, he relinquished any property interest voluntarily. Furthermore,

24   Plaintiff raises a loss of a liberty interest in "avoiding reputational stigma that could

25   foreclose future employment opportunities" for the first time in response to summary

26   judgment. This is a completely speculative claim, Plaintiff does not assert that he *has

27   suffered* reputational stigma, rather that now he must somehow avoid it. Moreover, there

28   is no evidence that Pima County "in declining to rehire [Plaintiff] . . . [made] any charge

against him that might seriously damage his standing and associations in his community." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972). "[T]here is no suggestion whatever that the [Plaintiff's] 'good name, reputation, honor, or integrity' is at stake." *Id*. "Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Id*. Summary judgment should be granted on Plaintiff's due process claim.

## IV.    RECOMMENDATION

Based upon the foregoing, the Court finds that Plaintiff has failed to meet his burden in opposing Defendant's motion for summary judgment. Accordingly, the Magistrate Judge recommends that the District Court enter an order:

(1)    GRANTING Defendant Pima County's Motion for Summary Judgment (Doc. 49); and

(2)    ENTERING Judgment for Defendant Pima County.

Pursuant to 28 U.S.C. § 636(b) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, any party may serve and file written objections within **fourteen (14) days** after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). A party may respond to another party's objections within **seven (7) days** after being served with a copy. No replies shall be filed unless leave is granted from the Hon. Angela M. Martinez. If objections are filed, the parties should use the following case number: **CV-23-00362-TUC-AMM**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge may result in waiver of the right of review. The Clerk of the Court shall terminate the magistrate reference and send a copy of this Report and Recommendation to all parties.

Dated this 4th day of February, 2026.

Eric J. Markovich
United States Magistrate Judge